UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| NATIONWIDE LIFE INSURANCE COMPANY, | ) ) ) |
| Plaintiff/Counterclaim Defendant, | ) ) |
| vs. | ) Case No. 4:04CV01746 AGF ) |
| ST. CLAIR MOBILE HOME PARKS, LLC, | ) ) ) |
| Defendant/Counterclaim Plaintiff/ Third Party Plaintiff/ Third Party Counterclaim Defendant, | ) ) ) ) |
| vs. | ) ) |
| TRIAD CAPITAL ADVISORS, INC., and JOSEPH MONTELEONE, | ) ) ) |
| Third Party Defendants/ Third Party Counterclaim Plaintiffs. | ) ) |

## MEMORANDUM OPINION

This diversity case is before the Court following a bench trial on the damages

aspect of the claims of Plaintiff Nationwide Life Insurance Company ("Nationwide"), an

Ohio corporation, against Defendant St. Clair Mobile Home Parks, LLC ("St. Clair"), a

Missouri limited liability company.[1]  Nationwide, the lender, filed suit against St. Clair,

the borrower, asserting that St. Clair had breached the Application for Securitized

Mortgage Loan (the "Loan Application") that St. Clair executed with Nationwide.  St.

---

[1]  The parties consented to jurisdiction by the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Clair filed a counterclaim for rescission, asserting that Nationwide had not adequately disclosed that St. Clair's mortgage broker, Triad Capital Advisors, Inc. ("Triad"), was also a loan correspondent and paid agent of Nationwide.

The Court previously granted partial summary judgment for Nationwide against St. Clair, finding that St. Clair had breached its agreement with Nationwide by failing to close on the commercial mortgage loan, and determining that St. Clair was not entitled to rescission. Doc. #43. The Court also denied St. Clair's motion for partial summary judgment, that sought to limit Nationwide's damages to retention of the commitment fees already paid by St. Clair, but the Court did not determine the amount of damages owed. Doc. #98. The issue of the amount of damages Nationwide may recover from St. Clair for the breach is now before the Court.

The Court held a bench trial on Nationwide's damages on September 5 and 6, 2006.[2] Central to Nationwide's damages claim is the question of whether St. Clair is liable under the Loan Application for Nationwide's "hedge losses." Based upon the trial testimony, the exhibits, the post-trial briefs of the parties, and the record as a whole, the Court makes the following findings of fact and conclusions of law and finds, in part, that St. Clair is not liable for these losses.

---

[2] Because the Loan Application between Nationwide and St. Clair contained a jury-waiver clause, the issue of the amount of damages owed Nationwide was tried to the Court, and the third-party claims between St. Clair and Triad were bifurcated for a separate jury trial.

**FINDINGS OF FACT**[3]

**Nationwide's Capital Markets Program**

As part of its business, Nationwide engages in commercial lending. In 2001, Nationwide decided to institute a real estate capital markets program. Up until that time, all of the commercial loans Nationwide made were held by Nationwide, in its general portfolio of loans. The new capital markets program had two aspects. On the "sale" side, Nationwide would originate and warehouse commercial real estate loans, and thereafter sell the loans into the capital market, as part of a larger pool of loans that would ultimately be packaged and sold on the market as commercial mortgage backed securities. On the "buy" side, Nationwide would also purchase commercial mortgage backed securities for its general account.

Nationwide first began to originate loans in the new program, referred to by some at Nationwide as "CMBS loans," in 2002. Nationwide would pool the CMBS loans it planned to sell in the capital market with loans from other financial institutions. The pool of loans would be rated and eventually sold as commercial mortgage backed securities, or bonds, to outside investors. Both the value of the overall pool of loans, as well as the value of Nationwide's proportionate contribution to the pool, were determined by a third-party rating agency. In the program in which Nationwide was participating in 2003 and 2004, the overall value of a typical loan pool was approximately one to two billion dollars. When the transaction at issue with St. Clair was entered into in 2004, the

---

[3]  Additional findings of fact are also set forth in the conclusions of law.

capital markets program at Nationwide was still in its beginning stages, and Nationwide's contribution to the overall pool was relatively small as compared to the contribution of the other participating financial institutions.

With regard to loans that it intended to sell into the capital market, it was Nationwide's practice to enter into a separate hedge agreement – or interest rate swap – with an unrelated financial institution, the terms of which mirrored, as closely as possible, the terms of the loan with the borrower. Nationwide acknowledged that its relationship with the party to the hedge transaction was separate from its relationship with the borrower. Nationwide would enter into the hedge agreement at the time it locked the interest rate on the loan to the borrower. The risk that Nationwide was attempting to hedge by the interest rate swap was the interest rate risk associated with the loan; the interest rate swap was not intended to hedge the risk that the loan would not close or to hedge any credit risk presented by the borrower. The hedge would be unwound when the loan was sold into the secondary market. There was some general testimony by Nationwide to the effect that Nationwide was required by regulation to terminate or unwind the hedge once it no longer held the underlying loan. Depending upon whether interest rates had moved up or down during the period the hedge was in place, a termination payment would be due either to Nationwide or to the other party to the swap transaction at the time the hedge was unwound.

After it began the capital markets program, Nationwide continued to make loans that it would maintain in its general portfolio. In evaluating whether to extend a loan, Nationwide would decide whether it would be a capital market or general portfolio loan.

Even after a loan was made, however, Nationwide could determine, in its sole discretion, whether to sell the loan into the capital market or keep it in Nationwide's portfolio. Nationwide might also hedge some or all of its general portfolio loans, and there could be hedge costs or losses associated with that transaction, as well.

As both Kathleen Knudson, Nationwide's director of mortgage loan applications, and Blake West, the managing director of its real estate capital markets program, testified, during the time period relevant hereto, the common industry practice with regard to capital market loans was for the lender to enter into a separate hedge loss or interest rate lock agreement with the borrower. This agreement would define the interest rate lock, describe the hedge agreement or interest rate swap, and provide specific information regarding the implications if the loan with the borrower did not close. Such agreements might also set margin requirements, whereby the borrower would be required to put up additional funds if the interest rates fluctuated in a manner that created exposure for the lender.

Nationwide, however, chose not to have a separate rate lock or hedge loss agreement with the borrower in connection with its CMBS loans. To create the form of "Application for Securitized Loan" it used for CMBS loans, Nationwide took the form it used for its general portfolio loans and made some changes. The Application for Securitized Loan form nowhere mentions the term "hedge loss"; the only reference to "hedging" in this Application is in paragraph 13 of the form (quoted below), which references "hedging costs" among the costs Nationwide may recover in certain circumstances. This same paragraph also appears in the application Nationwide used for

its general portfolio loans.  Nationwide did not include any information explaining the hedging process in its Application for Securitized Loan form.  West and Corsan Maley, Nationwide's portfolio manager, both testified that they did not know if Nationwide communicated to the borrower that Nationwide would enter into a hedge transaction. Knudson testified on cross-examination that she had thought there was more information about hedging in the Application form than actually appears, and that apart from the language in the Application form, Nationwide left it to its loan correspondents to transmit information about the hedge transaction to the borrower.

**Nationwide's Relationship with Monteleone**

Nationwide worked with loan correspondents around the country to locate and originate new commercial mortgage loans.  In 2003, Nationwide was looking for a new loan correspondent for the St. Louis area.  In February 2003, Knudson met with Joseph Monteleone, Triad's Executive Vice President, at a Mortgage Banker's Association meeting.  She thereafter met with him a second time in St. Louis.  Knudson discussed with Monteleone the general parameters of Nationwide's loan programs, and the types of loans Nationwide was seeking, and obtained more information about Triad.  She explained that Nationwide's CMBS program was basically a "conduit" program, under which Nationwide would originate a loan secured by commercial real estate and then sell the loan in a pool with other similar loans.  She advised Monteleone that one feature of Nationwide's program that was different from that of other conduit lenders, was that Nationwide did not enter into a separate "hedge loss agreement" with the borrower.  She described this feature as beneficial to borrowers, because in a typical hedge loss

agreement, there are margin calls that would require the borrower to put up additional funds if the interest rates moved to a point where the borrower's deposit was not enough to cover any potential losses due to the interest rate changes.

On April 7, 2003, Nationwide entered into a written Commercial Mortgage Correspondent Agreement with Triad,[4] a mortgage company with offices in St. Louis, Missouri, pursuant to which Triad would serve as loan correspondent for Nationwide in Missouri, primarily in the St. Louis area. Triad would bring lending opportunities to Nationwide, submitting completed Nationwide "Application/Contracts" for mortgage loans for acquisition and/or funding by Nationwide, and would thereafter service the loan. Nationwide's contacts with Triad were with Monteleone. St. Clair Ex. M-2.

After Triad was appointed as a loan correspondent, Knudson and other colleagues from Nationwide met with Monteleone, at which time they touted the benefits of Nationwide's CMBS program, describing in a "flip-chart" presentation why its program was better for commercial real estate borrowers than the programs of other conduit lenders. The flip chart was not further described or offered into evidence.

During the one-year period between the time Triad was first appointed as a Nationwide loan correspondent and the loan transaction with St. Clair, Nationwide completed a few loans through Triad, including a loan for a Kohl's store and a loan for a Lowe's store. Knudson and Monteleone also discussed some deals that never reached the

---

[4]     The agreement was with Triad Mortgage & Realty Funding Corporation. The parties do not distinguish between this entity and Triad Capital Advisors, Inc., and the Court will treat the two entities as identical for purposes of this lawsuit.

application stage. Monteleone also continued to have similar relationships with more than 30 other lenders. Knudson testified that she and Monteleone had discussions about the hedge process and "about hedge loss and about how it works," although she could not recall any of the particulars of these conversations, with one exception. Knudson recalled one instance, involving a borrower who was already working with another lender and who was unhappy with the hedge language contained in that lender's agreement. Knudson testified that the borrower had asked Monteleone for hedging loss language to be taken out if the borrower worked with Nationwide, and Knudson refused.

In cross-examination of Monteleone at trial, Nationwide introduced certain communications between Knudson and Monteleone related to a proposed loan for a shopping center with Sansone Group in August 2003. Nationwide Ex. 181. The Court assumes this is the same transaction about which Knudson testified. Sansone had been dealing with Prudential. Nationwide introduced an email dated August 27, 2003, from Monteleone to Knudson, in which Monteleone stated that Sansone was ready to accept the deal offered by Nationwide subject to having an understanding of how any hedge loss would work.

> It appears Sansone will take our deal subject to having a complete understanding of how Nationwide's Hedge-loss would work. [In other words] what events would trigger that. As you know this is what killed the PRU deal. They want to limit their exposure to the good faith deposits as you know, especially if Nationwide kills the deal. Under what circumstances would Nationwide trigger the "hedge-loss" provision. Can we limit it to "bad boy items"? Their fear is for example, Nationwide decides to terminate the transaction because of something Sansone can't control, such as, a major tenant goes bankrupt . . . and the deal unfolds and then there is hedge-loss."

Id.  Knudson responded by email that "it's all spelled out in paragraphs 13 & 14 in our Application – sorry, just don't have the time right now.  In the event of your example – they would get their $'s back - less costs incurred...  Please see if you can walk them thru this - Ok to give them Part I of Application."  Id.[5]  Sansone apparently closed the loan with Prudential, and it is not clear what transpired in the negotiations with Nationwide following this email exchange.

**Events Leading up to St. Clair's Loan Agreement with Nationwide**

Maha Alul ("Alul") is the managing member of St. Clair, holding a 98 percent ownership interest, with other family members owning the other 2 percent.  Alul acquired St. Clair, which at that time owned mobile home parks in Illinois, as part of her divorce settlement in 1994.  St. Clair thereafter refinanced the parks through Steve Jackman, a broker/lender whom Alul knew.  In December 2003, St. Clair sold the mobile home parks and acquired the Legends Terrace Apartments (the "Legends") as part of a tax-free exchange.  St. Clair financed the purchase of the Legends with an 18-month loan, in the principal amount of $13,250,000.  The loan had a floating interest rate of approximately 3 to 3½ percent, requiring payments of interest only.  At the time of the purchase, the

---

[5]  Exhibit 181 also contains a draft of Nationwide's preliminary loan quote dated August 22, 2003, which was apparently modified by Sansone to provide:

In the event that the lender terminates the loan application and or commitment for any reason, borrower will be refunded the good faith deposits less any actual out of pocket expense or legal fees incurred, (but specifically excluding hedge losses, termination fees, or any other financial losses alleged by lender; such costs, if any, to be borne by lender).

occupancy rate at the Legends was approximately 40 percent, but St. Clair was able to cover its debt service.

When St. Clair acquired the Legends, Monteleone was already familiar with the complex. He had attempted to obtain financing for the prior owner, and in connection therewith, had previously shown the complex to Knudson. Monteleone also knew Jackman and was aware that he had worked with Alul in connection with the purchase of the Legends, although Monteleone did not otherwise know Alul or St. Clair. After St. Clair purchased the Legends, Monteleone contacted Jackman and advised him that he was familiar with the complex and was interested in continuing to work on financing for it. Jackman, in turn, contacted Alul and asked her to meet with Monteleone to see what he had to offer. Although Alul was not seeking permanent financing at the time and was satisfied with the interest-only financing she had, she agreed to meet with Monteleone because the request came from Jackman.

Monteleone first met with Alul in mid-April 2004. He advised her that he had a relationship with many lenders and would get her the best possible deal from among them. Although he did not specifically discuss Nationwide as the most likely lender at this time, Monteleone believed that Nationwide had the best program, as the apartment complex had not yet stabilized and Nationwide was willing to lend on such properties if the borrower could post a letter of credit. Monteleone anticipated that any loan through Nationwide would be made as part of Nationwide's CMBS program and resold in the secondary market. Monteleone again contacted Knudson about the Legends and inquired about the possibility of providing long-term financing. She advised Monteleone that she

was interested and had him prepare a loan package.

Monteleone continued to move forward in his discussions both with Alul and Nationwide. As he obtained more information, Monteleone felt that the amount of the proposed financing was "a bit of a stretch," in terms of the value of the Legends, but he felt that it was a unique time for Nationwide to provide financing because rates were trending down, which justified an increased valuation of the complex. At the time that Monteleone presented the package to Nationwide, the rentals at the Legends were in the range of 66 percent. Knudson recognized that the income would not cover the debt service at the then-current fixed rates, and that a letter of credit would be required to cover the shortfall until the property stabilized. She also recognized that with the Legends' current rent levels, the loan would not qualify for sale in the secondary market, and that Nationwide would need to hold the loan until the property stabilized. Nationwide considered that the property would need to achieve a 93 to 94 percent occupancy level for three consecutive months before the letter of credit covering the shortfall could be released back to the borrower and the loan could be sold in the secondary market.

On May 4, 2004, Monteleone brought Knudson to the Legends to view the complex and meet Alul. Monteleone and Knudson got there early and toured the property. After Alul joined them, Knudson met with her briefly. They did not discuss Nationwide's rate lock or hedging practices at that time. In total, Knudson and Monteleone were at the Legends approximately 30-45 minutes. This was the only direct discussion Alul had with Nationwide. Following the meeting at the complex, Monteleone

advised Alul that Nationwide liked the asset.

In early May 2004, Knudson orally provided Monteleone with terms to transmit to St. Clair, and on May 10, 2004, Monteleone presented a loan quote from Nationwide to Alul. St. Clair Ex. O. The terms were for a fixed rate, ten-year loan, with a 30 year amortization, in the amount of $13,250,000. The rate would be fixed or "locked" when St. Clair signed the loan application and paid a 1 percent "good faith" deposit. Another 2 percent, a portion of which could be met with a letter of credit, would be due when Nationwide accepted the loan application.

Consistent with the terms of the loan quote, Monteleone explained to Alul that most of the 3 percent paid by St. Clair would be returned to St. Clair after the loan closed. He also discussed his understanding of what would happen if the loan did not close, advising her that the 3 percent deposit would be kept by Nationwide unless it was Nationwide who decided not to close. He did not discuss with Alul that Nationwide intended to enter into a separate hedge agreement with a third-party related to the loan or advise her that St. Clair could possibly be liable for a hedge loss if the loan did not close.

On May 12, 2004, Monteleone forwarded the Nationwide Loan Application to Alul and he thereafter went to her office to discuss it with her. St. Clair Ex. R. The Loan Application had two parts, Part I consisting of Nationwide's standard provisions applicable to all commercial securitized mortgage loans and Part II setting forth the particular terms related to the proposed loan to St. Clair. Monteleone and Alul went through Part II, section by section, discussing the principal, interest, and amortization. Monteleone did not review Part I of the Loan Application with Alul, advising her that the

terms reflected the industry standard. Alul did not review Part I of the Loan Application, but rather provided it to her attorney to review. Monteleone testified that he did not realize that Nationwide would seek to hold St. Clair liable for any hedge loss suffered by Nationwide if the loan did not close. It is undisputed that Monteleone did not discuss this possible liability with Alul or ever mention to Alul that Nationwide would be entering into a hedge agreement related to the loan. Alul did not know that St. Clair could possibly be held liable for the loss on a hedge transaction if the loan did not close.

The following day, on May 13, 2004, Monteleone urged Alul to have her attorney "just go over the important items" and "not spend too much time on the 'little items' as interest rates continue to rise quickly," and Alul agreed to go forward with the Loan Application. St. Clair Ex. V. At that time, St. Clair entered into a written Brokerage Agreement with Triad pursuant to which St. Clair employed Triad to arrange a financing commitment "substantially in accordance with the terms of the Application to Nationwide" for the Legends. The Brokerage Agreement required St. Clair to pay Triad a fee of $99,375 upon the closing of the loan, and provided that if St. Clair intentionally decided not to close the loan, through no fault of Triad, the fee would be considered earned and payable. St. Clair Ex. F-1.

## The Loan Agreement between Nationwide and St. Clair and Nationwide's Hedge Transaction

On the same day that Triad and St. Clair executed the Brokerage Agreement, May 13, 2004, Triad formally submitted the Loan Application to Nationwide on behalf of St. Clair. Part I of the Loan Application, in the bottom left-hand portion of each page,

identifies the form as "Capital Markets – 7-10-02 Version," and similar language appears above Alul's signature on Part II. The Application named Triad as the loan correspondent for the loan, stating that the loan correspondent may receive compensation from Nationwide in connection with the loan, and provided that the borrower agreed to deal solely with the loan correspondent on any matter arising from issuance of the Loan Application or the loan closing. The terms provided for a ten-year loan, in the amount of $13,250,000, at a fixed interest rate of 6.33 percent, and a monthly repayment schedule. The loan was to be secured by a deed of trust on the Legends and was scheduled to close on or before July 13, 2004.

Exhibit A to the Loan Application provided that the funding of the loan was conditioned upon the delivery by St. Clair to Nationwide of a letter of credit, with an expiration date of no earlier than 18 months of the closing date of the loan, the amount of which was to be calculated by Nationwide pursuant to a specified formula (the "shortfall letter of credit"). The shortfall letter of credit was to equal 3 times the annualized deficit at closing between the net operating income of the property and 1.25 times the annual debt service payments due under the terms of the loan documents. Nationwide Ex. 88 at N001020.

The Loan Application required payment by St. Clair of a non-refundable processing fee of $7,000, and an "Application Deposit" of $132,500 (1 percent of the loan amount). Paragraph 13 of Part I provided in relevant part as follows:

> APPLICATION DEPOSIT: In the event Nationwide does not accept
> the Application, the Application Deposit shall be refunded to the
> Applicant without interest, less all actual costs and expenses incurred

by Nationwide in connection with the negotiation, documentation, or funding of the Mortgage Loan . . . . If the Applicant/Borrower withdraws the application before Nationwide approves or disapproves the Application or if there is a misrepresentation of any material fact in the Application, Applicant/Borrower shall indemnify and hold Nationwide harmless for any actual loss, cost or expense (including any hedging costs) incurred by Nationwide arising from such withdrawal or misrepresentation by Applicant/Borrower.

Pursuant to paragraph 14 of Part I of the Loan Application, and Items 13 and 14 of Part II, St. Clair was required to pay a Commitment Fee of $397,500 (3 percent of the loan amount) upon Nationwide's acceptance of the Loan Application. The 1 percent Application Deposit would be credited toward the Commitment Fee, and the balance of the $397,500 could be satisfied by a letter of credit. Paragraph 14 of Part I also provided that if the loan did not close due to the borrower's failure to fulfill the terms and conditions of the Loan Application, the Loan Application would be cancelled, and upon cancellation, Nationwide would have the right to retain the Commitment Fee and pursue all other remedies available, including legal action to collect its damages, including loss of bargain, in excess of the Commitment Fee, as follows:

COMMITMENT FEE: As partial consideration for Nationwide's agreement to loan funds in the amounts and on the terms set forth herein, Applicant/Borrower shall deliver to Nationwide upon Nationwide's acceptance of this Application (a) cash in the amount shown in Item 14A of Part II of the Application and (b) a Letter of Credit in the amount shown in Item 14b of Part II of the Application. Said Letter of Credit shall have an expiration date of no earlier than six months after the Closing Date of this Application (the cash and Letter of Credit are collectively hereinafter referred to as the "Commitment Fee", the total amount of which is shown in Item 14). The cash portion of the Commitment Fee shall be returned to the Applicant/Borrower with the loan proceeds at closing, provided it is not being held for post closing obligations; the Letter of Credit portion of the Commitment Fee shall be returned to Borrower after

Nationwide has received the original executed Note, provided it is not being held for post closing obligations; but should the Mortgage Loan not close as provided for in this Application due to a failure of Borrower to fulfill the terms and conditions of this Application, or if this Application shall be canceled as set forth in sub-paragraphs (a) through (c) of the FINANCIAL RESPONSIBILITY paragraph herein, in each case strictly according to the terms thereof, then Nationwide shall have the option, without giving prior notice to Applicant/Borrower and without incurring liability of any kind, to cancel this Application and terminate all Nationwide's obligations hereunder. Upon cancellation of this Application . . . Nationwide shall have the right to retain the Commitment Fee in full and in addition, to pursue all legal and equitable remedies available to Nationwide, including without limitation, legal action to collect provable damages (including loss of bargain) in excess of the Commitment Fee.

Paragraph 31 of Part I, under the heading FEES AND EXPENSES

INCIDENTAL TO THE MORTGAGE LOAN, provided:

Whether or not closing occurs, Applicant/Borrower agrees to pay or reimburse Nationwide for all fees and expenses incidental to the Mortgage Loan herein contemplated, including, but not limited to, legal fees, Commitment Fee, M.A.I. Appraisal Fee, Inspecting Architect Fee, survey fee, Processing Fee, title fee, environmental engineer and/or consultant fees, and closing costs. Nationwide may pay these fees and expenses directly and reimburse itself from the funds being held as the Commitment Fee so long as such action is not in contradiction with the APPLICATION DEPOSIT and COMMITMENT FEE sections of this Application.

Paragraph 36 of Part I gave Nationwide the option at any time to "sell, transfer, or assign the Application, Mortgage Loan . . . or grant participations therein." It further provided that St. Clair was obligated to "cooperate with Nationwide and use reasonable efforts to facilitate the consummation of any sale or transfer made or any participation and/or securities created," and to furnish all relevant information that may be requested by any such investors or rating agency. The Loan Application also contained an

integration clause, in Paragraph 16.

Consistent with the terms of the Loan Application, St. Clair paid the $7,000

Processing Fee and the $132,500 Application Fee at the time the Loan Application was

submitted.

On May 13, 2004, immediately after St. Clair submitted the Loan Application,

Nationwide entered into a hedge agreement, or interest rate swap, with Morgan Stanley,

related to St. Clair's loan application. The hedge was structured to mirror the terms of

the loan, such that any increase or decrease in the value of the hedge due to an

intervening change in the interest rate, would be offset by the change in the value of the

underlying loan due to the interest rate change. Nationwide agreed, beginning August 1,

2004, to pay Morgan Stanley a fixed rate of 5.51 percent on an amount of $13,000,000,

for a ten year period, payable semi-annually. In exchange, Morgan Stanley agreed to pay

Nationwide a floating rate of interest, based on the 3-month LIBOR rate. Nationwide Ex.

117. In its internal Investment Transaction Memo, Nationwide described the "nature of

the risk to be hedged" as follows:

> The objective of the hedging relationship is to protect the value of the
> assets to be sold from adverse changes in the benchmark interest rate.
> If rates rise, the interest rate hedge gain will offset the adverse change
> in the asset's value. If rates fall, the interest rate hedge loss will be
> offset by increases in the asset's value.

Frederick Gwin, the managing director of portfolio management derivatives at

Nationwide, testified that the decision to place a hedge is an internal, discretionary

decision of Nationwide regarding how best to use its funds. If interest rates moved up,

such that Nationwide at termination of a hedge transaction received more from the

floating rate than the fixed rate it was obligated to pay, that would be income to Nationwide. If interest rates moved down and Nationwide had to make a payment at termination, that would typically be referred to as a "hedge loss."

By letter dated June 14, 2004, Nationwide accepted St. Clair's Loan Application, subject to certain "clarifications," one of which related to the amortization of the loan schedule used to calculate the shortfall letter of credit required pursuant to Exhibit A. Knudson testified that the failure to reference an amortization schedule earlier had been an oversight by Nationwide. This modification resulted in a significant increase in the amount of the shortfall letter of credit. Because the June 14, 2004 "clarification" contained a material change to the terms of the Loan Application, Nationwide considered its letter to be a counter-offer, which required further acceptance by St. Clair. St. Clair Ex. K-1.

Knudson called Monteleone to let him know of the loan approval and of the need to get the modification letter signed. She did not discuss with him how the modification would impact the amount of the shortfall letter of credit. Knudson testified that she called Monteleone again a few days later. While interest rates had been going up in May when St. Clair signed the Loan Application, by now the rates were going down, and Knudson testified that she told Monteleone that Nationwide was incurring a hedge loss and he needed to get the letter signed. Knudson did not specifically discuss with Monteleone the implications to St. Clair of any hedge loss with regard to this transaction, either at this time or any other time.

On June 17, 2004, St. Clair accepted the modified Loan Application and paid

Nationwide the balance of the $265,000 due, in cash, resulting in a Commitment Fee payment of $397,500.

**St. Clair's Breach, Nationwide's Hedge Loss, and this Lawsuit**

In light of the June 14 modification to the formula for calculating the amount of the shortfall letter of credit, the amount, as calculated by Nationwide, was more than Alul and Monteleone had discussed, and St. Clair was unable to provide the shortfall letter of credit that it was required to provide as a condition to the July 13, 2004 closing. In these circumstances, Nationwide believed it was authorized by the terms of the Loan Agreement unilaterally to extend the closing date, without approval or acceptance by the borrower. By letter dated July 13, 2004, Nationwide extended the closing date until September 13, 2004, adding 5 basis points to the interest rate of the loan for each month of extension. Nationwide thereafter extended the closing date a second time, again increasing the interest rate for each month the closing was extended.

In December 2004, Nationwide decided to cancel the Loan Application due to St. Clair's failure to fulfill its terms. Knudson testified that the only condition St. Clair failed to fulfill was the delivery of the shortfall letter of credit in the amount required by the Loan Application, as modified by the June 14, 2004 letter.

On December 2, 2004, Nationwide unwound its hedge with Morgan Stanley, as it was required to do once the underlying asset no longer existed. By letter dated December 3, 2004, Nationwide notified St. Clair that it was exercising its option to cancel the Loan Application and terminate all of Nationwide's obligations thereunder. In connection with unwinding the hedge on that date, Nationwide paid a termination

payment to Morgan Stanley (i.e., suffered a hedge loss) in the amount of $912,341.48, which amount was arrived at through negotiations between Nationwide and Morgan Stanley.

The decision to unwind the hedge on that particular date was made solely by Nationwide, and it did no internal analysis regarding the best time to unwind the hedge. Nationwide acknowledged that nothing prevented it from unwinding the hedge in July 2004 or on any other date it wished, and its witnesses did not know if the hedge loss would have been greater or lesser if it had been unwound before December 2, 2004.

In its December 3, 2004 letter to St. Clair, Nationwide asserted that under Paragraph 31 of the Loan Application, St. Clair was obligated to reimburse Nationwide for fees and expenses incidental to the mortgage loan, consisting of "Hedge Loss" in the amount of $968,000, and legal fees in the amount of $17,266.88; the total offset by the Commitment Fee. Thus, Nationwide demanded a total of $587,766.88. St. Clair Ex. A-2. This was the first time Nationwide had unwound a hedge because a loan did not close, as almost all loans accepted by Nationwide closed, and Nationwide knew of no other instance in which it had attempted to recover a hedge loss from an underlying borrower. St. Clair did not comply with Nationwide's demand, and on December 14, 2004, Nationwide filed this action against St. Clair for breach of contract.

On July 13, 2005, this Court granted partial summary judgement to Nationwide concerning St. Clair's liability. The Court held that by failing to provide the letter of credit as required in the Loan Application (i.e., the shortfall letter of credit), St. Clair had breached the agreement between the parties. On August 4, 2006, the Court denied St.

Clair's motion for partial summary judgement on the issue of damages, finding that paragraph 14 of the Loan Application did not operate as a liquidated damages clause precluding Nationwide from recovering damages beyond the Commitment Fee. Doc. #98.

On August 18, 2006, with the filing of an Amended Complaint, Nationwide claimed that in addition to its attorney's fees incidental to this lawsuit, its damages were "in excess of $774,107.49, which consists of lost profits of not less than $259,266.00 and a hedge loss in the amount of $912,341.49, for total of $1,171,607.49, reduced by the $397,500 Commitment Fee, which Nationwide has retained." Nationwide asserted that its hedge loss was part of its lost benefit of bargain damages and, alternatively, was recoverable as special damages. Doc. #129.

By Memorandum and Order dated August 31, 2006, this Court granted a motion in limine precluding Nationwide from presenting evidence concerning its attorney's fees incurred in prosecution of this lawsuit, based on a finding that the terms of the Loan Application did not entitle Nationwide to recover such fees. Doc. #152.

At trial, Nationwide provided evidence regarding its damages, including lost profits. The individual who oversaw Nationwide's capital markets program testified that Nationwide routinely analyzed the profit it expected to make on a loan at the time the loan was negotiated, based on such matters as the secondary-market conditions, the terms of the loan, and the stability of the underlying asset. Based on its early analysis, Nationwide expected to make $259,266 on the St. Clair loan.

Nationwide also presented evidence of an after-the-fact analysis, based on

evidence that the Legends achieved a 93 percent occupancy rate in March 2005, and Nationwide's testimony that the asset would have sufficiently stabilized to be sold in the secondary market in June 2005. Assuming that the St. Clair loan had closed and been included as part of the PWR 8 pool of loans that Nationwide and others took to the market in June 2005, Nationwide presented evidence that its profit, including any losses attributable to the hedge transaction, would have been $347,452. However, Nationwide was seeking only the lower figure of $259,266. Had the loan closed in July 2004, and a hedge not been placed, Nationwide presented testimony that the profit from the sale of the loan in June 2005 would have been $1,889,662.

At trial, St. Clair did not challenge Nationwide's right to retain the full amount of the Commitment Fee. In its post-trial briefs, St. Clair also agreed Nationwide was entitled to reimbursement of the legal fees incident to the loan processing. But St. Clair argued that Nationwide was not entitled to recover its hedge loss, that its lost profits were speculative, and that interest on the legal fees was not recoverable, as the amount was not sufficiently liquidated.

## CONCLUSIONS OF LAW

The parties agree that Missouri law controls the present dispute, as the Loan Application specifically provides that the rights and obligations of the parties were to be governed by, and construed in accordance with, the law of the state where the property securing the loan was located, and the Legends is located in Missouri. Nationwide argues that its hedge losses are recoverable as loss-of-bargain damages. In the alternative, Nationwide seeks its hedge losses as special damages. The Court concludes, and the

22

parties agree, that if Nationwide can recover its hedge losses, it would be under paragraph 14 of the Loan Application which states that Nationwide shall be entitled to bring a "legal action to collect provable damages (including loss of bargain) in excess of the Commitment Fee."

Missouri law provides that "[t]he cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." <u>Dunn Indus. Group, Inc. v. City of Sugar Creek</u>, 112 S.W.3d 421, 428 (Mo. 2003) (en banc). Missouri law further provides that in construing contractual provisions, a court "is to avoid an interpretation that renders other provisions meaningless. It is preferable to attribute a reasonable meaning to each clause and harmonize all provisions, rather than leave some provisions non-functional and nonsensical." <u>Nodaway Valley Bank v. E.L. Crawford Constr., Inc.</u>, 126 S.W.3d 820, 827 (Mo. Ct. App. 2004) (citations omitted). Furthermore, under Missouri law, "'one who signs a contract is presumed to have known its contents and accepted its terms.'" <u>Warren Supply Co. v. Lyle's Plumbing, L.L.C.</u>, 74 S.W.3d 816, 819 (Mo. Ct. App. 2002) (quoting <u>Wired Music, Inc. of the Great Midwest v. Great River Steamboat Co.</u>, 554 S.W.2d 466, 469 (Mo. Ct. App. 1977)).

Missouri recognizes the following general principles with regard to breach-of-contract damages:

> [F]irst, that damages which may fairly and reasonably be considered as naturally arising from a breach of contract, according to the usual course of things, are always recoverable; and, second, that damages which would not arise in the usual course of things from a breach of the contract, but which do arise from circumstances peculiar to the special care [sic], are not recoverable unless the special circumstances are known or have been communicated to the person who breaks the contract.

W. C. Hardesty Co. v. Schaefer, 139 S.W.2d 1031, 1035 (Mo. Ct. App. 1940). "The particular facts and circumstances of each case dictate which measure of damages is appropriate. As a general rule, in a breach of contract case, the goal in awarding damages is to put the non-breaching party in as good a position as he or she would have been in if the contract had been performed." Gee v. Payne, 939 S.W.2d 383, 385 (Mo. Ct. App. 1997) (citations omitted).

Here, the Court concludes that the language of the Loan Application itself does not establish Nationwide's entitlement to recover its hedge loss of over $900,000. Paragraph 14, the operative paragraph under which Plaintiff seeks damages, nowhere mentions hedge losses. The only mention of "hedging" references "hedging costs" and appears in Paragraph 13 of Part I of Nationwide's standard loan Application. As quoted above, this paragraph provides in relevant part,

> If the Applicant/Borrower withdraws the application before Nationwide approves or disapproves the Application or if there is a misrepresentation of any material fact in the Application, Applicant/Borrower shall indemnify and hold Nationwide harmless for any actual loss, cost or expense (including any hedging costs) incurred by Nationwide arising from such withdrawal or misrepresentation by Applicant/Borrower.

Neither of the situations contemplated by this paragraph occurred; St. Clair did not withdraw the Loan Application before Nationwide accepted it, and there was no misrepresentation by St. Clair in the Application. It is true that this paragraph mentions "hedging costs" as a "cost or expense," providing some notice that Nationwide could incur "hedging costs" in connection with the loan, perhaps even before it accepted the Application. But the Court finds this language would not put a borrower/applicant on

notice that it would be liable for Nationwide's hedge losses following a breach by the applicant/borrower, under paragraph 14 as "provable damages." Indeed, the fact that reference is made to hedging costs in one paragraph of Part I of the Loan Application (paragraph 13) and not in another (paragraph 14), suggests that hedge losses do not apply in the second circumstance. Nationwide's witnesses all acknowledged that other than this reference in paragraph 13, the Loan Application does not specifically disclose that Nationwide would be entering into a hedge transaction or explain that St. Clair might be liable for such hedge losses if the loan failed to close due to circumstances such as its inability to obtain the standby letter of credit.

At best, the Loan Application itself is ambiguous on this point. Under Missouri law, the interpretation of an ambiguous contract is to be based upon an analysis of the extrinsic circumstances surrounding the transaction. Linnenbrink v. First Nat'l Bank of Lee's Summit, Mo., 839 S.W.2d 618, 622 (Mo. Ct. App. 1992) (citing Ridley v. Newsome, 754 S.W.2d 912, 915 (Mo. Ct. App. 1988). "'Courts may look at the contract itself, any subsidiary agreements, the relationship between the parties, and the construction placed upon the contract by the parties themselves manifested by their own actions and deeds.'" Id.

In addition, "[w]here a contract is fairly open to two or more interpretations, that construction will be adopted which is against the one who prepared the contract." Graue v. Mo. Property Ins. Placement Facility, 847 S.W.2d 779, 785 (Mo. 1993) (en banc) (citation omitted); see also Byrd v. Frank B. Wilson Trust ,182 S.W.3d 701, 706 (Mo. Ct. App. 2006) (ruling against drafter of real estate brokerage contract on a matter on which

contract was ambiguous, where none of the contract provisions cited by the drafter expressly supported drafter's position); <u>Triarch Indus., Inc. v. Crabtree</u>, 158 S.W.3d 772, 776, 777 n.7 (Mo. 2005) (en banc); <u>Linnenbrink</u>, 839 S.W.2d at 622 (stating the general rule in Missouri that an ambiguous contract should be construed in favor of the party who merely signed it and against the document's drafter).  The Loan Application here is a form provided by Nationwide.

In considering the extrinsic circumstances surrounding the transaction between St. Clair and Nationwide, the Court finds no support for Nationwide's alternative position that it was foreseeable to St. Clair that St. Clair bore the risk of any hedge loss sustained by Nationwide if St. Clair did not close the loan.  Alul was not a sophisticated commercial borrower or developer, like Sansone, and had no reason to know of Nationwide's hedging practices.  Indeed, the ultimate question in this case is who bore the risk related to the hedge.  Clearly, Nationwide could have placed the risk on St. Clair by including a provision to that effect in its Loan Application, as was the industry practice.  Instead, Nationwide made the conscious decision not to include in its Loan Application any definition or explanation of a rate lock agreement or hedge loss.  It is true, as Nationwide argues, that paragraph 36 and notations on the Loan Application indicate that the loan would be sold in the secondary market, but the Court concludes that this was not sufficient to put St. Clair on notice that if the loan was not closed due to the borrower's nonperformance, the borrower would be liable for Nationwide's hedge losses.

Nationwide argues that the hedge loss – or cost to unwind the hedge – it is seeking to recover constitutes general loss-of-bargain damages, and as such, need not have been

foreseeable to St. Clair.  As stated above, under Missouri law, general breach-of-contract damages are those that may "fairly and reasonably be considered as naturally arising from a breach of contract, according to the usual course of things." W. C. Hardesty Co., 139 S.W.2d at 1035.  Nationwide argues that at the time it committed to a fixed interest rate on the loan, Nationwide anticipated a profit of $259,266, and that it entered into the hedge transaction to assure this profit and protect itself from fluctuations in the interest rate.  Calculated after the fact, based upon relevant figures, Nationwide presented evidence that it would have actually had a net profit of $347,000.  As such, Nationwide contends that it should be entitled to its hedge losses as part of "loss of bargain" damages. Without a hedge, Nationwide argues that its loss of bargain damages, assuming a sale in the June 2005 pool, would have been the much higher figure of  $1,889,662.25.  Indeed, Nationwide asserts, the hedge worked to limit the damages of St. Clair.

But Nationwide's argument turns loss of bargain analysis on its head, and ignores the party with whom the "bargain" was reached.  As Nationwide's witnesses unequivocally testified, at the time it entered into the loan agreement, Nationwide estimated a profit of $259,266 from the sale of its loan to St. Clair.  Even employing an after-the-fact analysis, that profit would have been no more than $347,000.[6]  By its own admission, Nationwide entered into the hedge transaction to assure that profit and to protect itself from fluctuations in the interest rate during the time it was holding or warehousing the loan, i.e., the period from when it locked the interest rate and the date

---

[6]  As set forth in paragraph 14 of the Loan Application, under these circumstances Nationwide would not have been entitled to retain the Commitment Fee paid by St. Clair.

when the loan could be sold in the secondary market. Here, that time period would have lasted more than one year, as the Legends did not stabilize sufficiently for sale in the secondary market until at least June 2005. Had interest rates gone up during this period, and the loan not closed, Nationwide would have made a considerable profit on the hedge (with no offsetting loss on the value of the loan), which profit would not have inured to the benefit of St. Clair. Nationwide elected, unilaterally and for its own benefit, to enter into an independent hedge transaction with a third party in order to fix its anticipated profits. That hedge transaction was not part of its bargain with St. Clair, and neither the losses nor the profits that would result from the independent hedge transaction serve to change Nationwide's anticipated bargain related to the loan to St. Clair.

Nationwide's further argument that disregarding the hedge would entitle it to damages for lost profits of $1,889,662.25 similarly has no basis, as even Nationwide never anticipated entering into such a transaction.

Nor is the Court persuaded that the losses attributable to the hedge transaction, as part of its benefit of the bargain, need not have been foreseeable by St. Clair. Nationwide quotes the following sentence from <u>Birdsong v. Bydalek</u>, 953 S.W.2d 103, 116 (Mo. Ct. App. 1997), for the proposition that under Missouri law, the non-breaching party need not demonstrate that its "benefit of the bargain" damages were foreseeable: "In an action for breach of contract, a plaintiff may recover the benefit of his or her bargain as well as damages naturally and proximately caused by the breach and damages that could have been reasonably contemplated by the defendant at the time of the agreement." <u>Id.</u> Nationwide reads the "reasonably contemplated" language in the passage as applying to

only the second clause and not the first.  That passage, however, continues as follows:

> Turning to 11 SAMUEL WILLISTON & WALTER H.E. JAEGER, A TREATISE ON THE LAW OF CONTRACTS § 1344 (3d ed. 1968), we find that in contracts, a breaching party is only liable for those consequences that were reasonably foreseeable at the time the parties entered into the contract.  THE RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981) provides more insight into the issue of foreseeability, stating:
>
>> (1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
>>
>> (2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
>>
>> (a) in the ordinary course of events, or
>>
>> (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

Id.  Thus the question of foreseeability is relevant even for the recovery of general loss of bargain damages.

> The Supreme Court in another state expressed this principle as follows:
>
> All contract damages, whether general or special, economic or non-economic, are recoverable only if the damages were the foreseeable result of a breach at the time the contract was made.  See, e.g., Restatement (Second) of Contracts, §§ 351 & 352 (1981).  A foreseeability requirement is inherent in every contract case because contractual liability is determined by whether such liability was within the contemplation of the parties at the time of contracting.  See id.; Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854).

Giampapa v. Am. Family Mut. Ins. Co., 64 Pac.3d 230, 240 (Col. 2003) (en banc).  The Court believes that this is an expression of the law in Missouri as well.

In connection with the Loan Application, losses from Nationwide's hedge

transaction were neither reasonably contemplated nor reasonably foreseeable by St. Clair, either as part of Nationwide's loss of bargain or as special damages.

Questions remain as to whether (1) Monteleone had actual knowledge that if St. Clair breached the Loan Agreement by failing to comply with its terms, St. Clair would be liable for hedge loss sustained by Nationwide related to the loan; and (2) if so, whether this knowledge can be imputed to St. Clair. The Court first concludes, based upon the record, that Monteleone (acting on behalf of Triad) acted as a dual agent for both Nationwide and St. Clair at all relevant times. A dual agency arises "where two or more principals employ the same agent, whether as a means of dealing with one another or to protect their common interests." Weems v. Montgomery, 126 S.W.3d 479, 486 (Mo. Ct. App. 2004) (citation omitted). Here, Triad had written agreements with both of these entities to act on their behalf in the loan transaction at issue, and Triad stood to benefit monetarily from each relationship for its efforts. St. Clair agreed to pay Triad a brokerage fee and Nationwide agreed that Triad would service loans Triad originated as Nationwide's loan correspondent.

It is well settled in Missouri that "the knowledge of an agent is the knowledge of the principal." Thomason v. Miller, 555 S.W.2d 685, 688 (Mo. Ct. App. 1977) (citing Rainey v. Foland, 555 S.W.2d 88, 92 (Mo. Ct. App.1977)); McDermott v. Burpo, 663 S.W.2d 256, 261 (Mo. Ct. App. 1983) (holding that knowledge of a certain fact by a dual agent was imputed to both principals) (citing Thomason, 555 S.W.2d at 688). Thus Monteleone's knowledge is imputed to St. Clair.

The Court concludes, however, that Monteleone did not have clear knowledge that

St. Clair was potentially liable for Nationwide's hedge loss if the Loan Application were breached, as opposed to hedging costs if the Application were withdrawn prior to acceptance by Nationwide or if St. Clair misrepresented a material fact in the Application. Although Knudson testified that she had conversations with Monteleone "about hedge loss and about how it works," she could not recall any of the particulars of these conversations. At the time of the Loan Agreement with St. Clair, Monteleone had only been working with Nationwide for one year, and had completed only a few loans with Nationwide. He was also working with numerous other lenders during this time period, each of which had different provisions in their agreements, and he relied on the lenders to put the terms in their written agreements.

Monteleone did know that hedging was involved in Nationwide's CMBS program, but the record establishes that although he had discussed the implications of hedge loss in connection with the proposed Sansone deal, he was unclear, as late as August 2003, about the implications of this practice. Moreover, the same email exchange that establishes Monteleone's confusion on the matter, also establishes that Knudson was aware of Monteleone's confusion. When he asked Knudson for an explanation, she told him she was too busy to respond and referred him to paragraphs 13 and 14 of Nationwide's Loan Application. As determined above, these paragraphs did not put a reasonable person on notice of the potential liability at issue here.[7]

---

[7] From the testimony, it is fair to assume that these paragraphs were the same as those in St. Clair's Loan Application, and Nationwide, who offered the evidence, has not suggested otherwise.

Furthermore, the fact that Knudson affirmatively advised Monteleone that Nationwide did not require its borrowers to sign a separate hedge-loss agreement, and that she presented this as a benefit to the borrower, might reasonably have led him to believe that under the circumstances of this case, St. Clair would not be liable for hedge loss sustained by Nationwide.

Where, as here, Nationwide elected to omit information regarding the hedge transaction from its written agreement, and was relying on its loan correspondents to advise the borrower that the borrower would be liable for any hedge loss under paragraph 14 of the Loan Application if the loan did not close due to the borrower's failure to fulfill a condition, it was incumbent upon Nationwide to assure that its loan correspondents had a clear understanding of this fact.  This, Nationwide did not do.  From the evidence, the Court concludes that at the time of the transaction with St. Clair, Monteleone reasonably believed that St. Clair's damages would be limited to the loss of the Commitment Fee if St. Clair were unable to close on the loan under the circumstances described in paragraph 14.

In sum, the Court concludes that the terms of the Loan Application do not unambiguously provide for the recovery by Nationwide of its hedge loss, especially when construing the Loan Application against Nationwide as the drafter.  The Court further concludes that neither the extrinsic circumstances surrounding the transaction, nor imputing Monteleone's knowledge to St. Clair, put St. Clair on notice that if it did not close on the loan due to its own nonperformance, it would be liable for Nationwide's hedge loss.  The Court need not reach St. Clair's further argument that the lost profit

calculations offered by Nationwide are speculative, as even Nationwide's highest calculation of $347,000 is less than the amount of the Commitment Fee it has retained.

The last issue to be resolved is Nationwide's entitlement to damages to cover its legal fees and costs related to processing the Loan Application, in the amount of $17,266.88 (plus interest from the date this action was filed). Pursuant to Paragraph 31 of the Loan Application, St. Clair was obligated to reimburse Nationwide for these fees, whether or not the loan closed. As noted above, St. Clair concedes that Nationwide is entitled to recover the amount of its legal fees, but challenges Nationwide's entitlement to prejudgment interest. The Court concludes, based on St. Clair's concession, that St. Clair is liable for damages in the amount of the legal fees claimed, but the Court rejects St. Clair's argument that Nationwide's damages were not sufficiently liquidated for an award of prejudgment interest on this amount. St. Clair references Nationwide's December 3, 2004 demand letter, and bases its argument on the fact that Nationwide thereafter changed, several times, its calculations as to the hedge loss and lost profits. But Nationwide seeks interest from the date it filed its complaint, which asserted in a separate paragraph that Nationwide was entitled to the legal fees in question, and the claimed amount of the legal fees related to processing the loan has never changed. Inasmuch as St. Clair concedes its liability for the amount of the legal fees, and the amount of those fees was liquidated, it shall also be liable for prejudgment interest on this amount.

## CONCLUSION

Nationwide may retain all the fees paid to it by St. Clair. In addition Nationwide is entitled to $17,266.88 (plus interest from the date this action was filed) in legal fees

related to processing the Loan Application.

Accordingly,

**IT IS HEREBY ORDERED** that judgment is entered in favor of Plaintiff

Nationwide on its claim for breach of contract against Defendant St. Clair in the amount

of the fees already paid Nationwide, plus $17,266.88 (plus interest from the date this

action was filed).


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of November, 2006